**AFFIRM and Opinion Filed August 15, 2007**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-06-00589-CV

## IN THE INTEREST OF A.R., A CHILD

On Appeal from the 301st District Court
Dallas County, Texas
Trial Court Cause No. 03-18320-T

## OPINION

Before Justices Wright, Richter, and Smith[1]
Opinion By Justice Richter

This appeal arises out of a post-divorce modification action in which a jury awarded custody

of A.R., a minor, to appellee Jamie Rosenthal, the father. Appellant Janay Rosenthal, the mother,

appeals the trial court's final award of custody, possession, and access, and a separate order of

contempt.[2] In seven issues, mother asserts the trial court abused its discretion by: (1) conditioning

supervised visitation on the posting of a $50,000 bond; (2) awarding attorney's fees in the nature

of child support; (3) granting counsel's motion to withdraw and denying mother's motion for

continuance; (4) not conducting a hearing on mother's motion to recuse; (5) failing to take judicial

notice of an action pending in another court; (6) failing to consider the best interest of the child; and

---

[1] The Honorable Bea Ann Smith, Justice, Court of Appeals, Third District of Texas at Austin, Retired, sitting by assignment.

[2] In addition to the parties named above, the "Justice for Children" organization submitted an amicus brief.

(7) omitting instructions from the jury charge. Finding no reversible error, we affirm the judgment of the trial court.

## I. BACKGROUND

Mother and father were divorced on June 15, 2004, when their child, A.R., was four years old. The divorce decree awarded mother and father joint managing conservatorship and mother possessory conservatorship.

Mother wanted the child to be a model. On several occasions during father's court-ordered visitation period, mother denied the father access to A.R.. On one such occasion, mother took the child to New York for modeling-related activities. As a result, father moved that mother be held in contempt. On October 28, 2004, mother was served with an amended motion for contempt. A November 29, 2004 docket entry reflects that mother was held in contempt for failing to produce the child in accordance with the divorce decree on three occasions. The next day, mother made a videotape of the child in which she has the child describe inappropriate behavior allegedly engaged in by father.

On January 5, 2005, mother took the child to the Child Advocacy Center for professional investigation of the child's statements concerning father's inappropriate behavior. The child was interviewed and made no outcry. On January 6, 2005, mother repeated the child's allegation in a motion to modify father's possession. The court ordered a psychological evaluation of the parties, the appointment of a counselor for the child, and the appointment of an amicus attorney[3] to protect the best interest of the child. The court further ordered that father's possession of the child be supervised until the psychological investigation could be completed.

---

[3] *See* TEX. FAM. CODE ANN. §107.001(1), §107.003 (Vernon 2006)

During the time father had supervised possession, mother continued to make allegations of sexual abuse. The statements allegedly made by the child also changed. Initially, the alleged conduct involved what has been described as "fanny flashing." As the case continued, mother claimed the child made other statements concerning sexually inappropriate behavior, including a statement about inappropriately touching the father. Despite the fact that father had not been alone with the child, mother took the child to three different physicians for a vaginal exam, alleging to each that father had abused the child. None of the physicians found any reason to believe sexual abuse had occurred. After father learned about the child's visits to the physicians, he expressed concern that the child was being abused by someone and contacted CPS.

Between January 5, 2005, and January 11, 2006, mother retained three attorneys who appeared in succession as mother's counsel of record. Mother also retained Richard Ducote, a non-resident attorney affiliated with the group "Justice for Children." Mother retained Ducote to consult with her on legal issues involving sexual abuse and family court procedures. Mother borrowed money from her parents to pay Ducote a $50,000 flat fee. Ducote initially informed the court that his associate would appear as co-counsel with mother's second counsel of record. He then requested mother's third counsel of record sponsor his admission *pro hoc vice*, but she declined. After mother's fourth counsel appeared, he sponsored Ducote's requested admission. At the hearing on the motion for Ducote's admission *pro hoc vice*, the court heard testimony about the number of states that had refused to admit Ducote *pro hoc vice*, as well as the state and federal courts where his admission had been granted and subsequently withdrawn. There was also testimony about the number of times Ducote had been sanctioned in state and federal courts across the country, and his filing bankruptcy to avoid payment of sanctions. Ducote was questioned about his involvement in another case involving a mother's allegations of abuse where the child was abducted by the mother.

-3-

Ducote denied participating in the abduction. The trial court denied Ducote's motion for admission.

For several months, mother refused to participate in the court ordered evaluation by the psychologist, but finally relented. In the interim, the court enjoined the parties from discussing the allegations of sexual abuse with the child. Notwithstanding the court's order, mother continued to discuss the allegations with the child, and made several videotapes of these discussions. In several of these video sessions, the child begged mother not to videotape her and indicated she did not want to continue. On each occasion, mother ignored the child's protests and distress, and continued taping. During the course of the case, mother made seven different reports to CPS concerning the same allegation of abuse. The alleged abuse was never substantiated.

In June 2005, father filed an emergency motion to have the child removed from mother and to have her possession supervised. The motion asserted mother was violating court orders not to discuss sexual abuse or the case with the child. The motion further asserted the mother's continued possession of the child would impair the CPS investigation and further damage the child. The next day, father filed a motion for writ of attachment because mother refused to surrender the child. The court ordered the child removed from her mother and placed in the custody of her paternal grandparents pending a hearing.

The issue of mother's possession was set for a hearing in July. When the parties appeared, mother requested that the hearing be rescheduled. The parties and the court agreed to reschedule. But father raised concerns about Ducote's involvement and mother's potential for flight in the interim. The amicus attorney shared these concerns, and informed the court that she had conducted research on Ducote and spoken to attorneys opposing him in cases across the United States. The attorney reported that Ducote has multiple web sites designed to attract women who believe they have been battered or their children sexually abused. In articles posted on these sites, he proclaims

-4-

the courts don't know what they are doing and are not protecting the children. He encourages his clients to disobey court orders and obstruct justice. The attorney further reported that Ducote had numerous sanctions and judgments against him for frivolous motions that had not been satisfied. The attorney also told the court that there were at least 3-4 cases in which Ducote is the attorney and the children had disappeared. The amicus attorney told the court she believed mother was a flight risk because she paid Ducote $50,000 instead of spending the money on something that might benefit the child. The court abated mother's access to the child until the date of the rescheduled hearing.

In September 2005, father filed an amended motion to suspend mother's possession, to require bond, and for additional temporary orders. The motion expressed concern about whether mother had retained Ducote to assist in the abduction of the child. Significant documentation about Ducote and his judgments, sanctions, and disciplinary actions was attached to the motion. The attachments to the motion also included the affidavit of an investigator retained to investigate a kidnaping in one of the cases in which Ducote was involved. The investigator stated that anytime Ducote is involved in a case, the parent and child are considered a high risk for flight from the court, not just because of Ducote, but because of the groups with which Ducote is involved. The motion further asserted that when Ducote is involved in cases, there is a pattern of false allegations of child abuse, the filing of multiple unfounded pleadings, and suing the attorneys, investigators, therapists, evaluators and ad litems appointed by the courts. The motion described mother's recent behavior as frantic, bizarre, and escalating. Mother was described as going to the child's daycare on a daily basis, removing the child from the other children and activities and sitting alone with her. Mother is also described as taping presents and cards for the child on the door of father's apartment, including a book graphically discussing and demonstrating human reproduction. After a hearing, the court ordered, *inter alia*, that mother's possession be supervised and contingent on the posting of

–5–

bond.

When the court-ordered evaluations concluded, the psychologist and the child's counselor recommended that father be awarded possession of the child. Father filed a counter-motion to modify, requesting the child be removed from mother and that he be awarded full custody.

Prior to trial, mother's third attorney moved to withdraw from the case. Mother told the court she did not oppose the motion as long as the trial court would grant her a continuance. The court, having cautioned the parties months earlier there would be no continuance, denied mother's motion. But the court determined counsel had demonstrated good cause and granted the motion to withdraw. Mother also filed two motions to recuse the trial judge. The motions were referred to and denied by the presiding judge.

Ducote and his organization continued to actively advise mother throughout the litigation. Mother instructed her counsel to send discovery and other litigation matters to Ducote for his review and approval. A Texas attorney affiliated with Ducote's organization ultimately entered an appearance as co-counsel to mother's fourth counsel of record. Ducote remained actively involved. He and his staff attended hearings and the trial. During the trial, Ducote and his staff engaged in disruptive behavior such as sitting very close to the jury while videotapes were played, constantly and conspicuously passing notes, and talking on the phone. The court warned Ducote the behavior would not be tolerated. When the disruptions continued, the court had Ducote and one of his staff removed from the courtroom.

The modification of conservatorship was tried to a jury. The only issues submitted to the jury were issues of conservatorship. After a seven day trial, on March 2, 2006, the jury deliberated for less than 30 minutes before awarding sole managing conservatorship to father. The court entered its final modification order on April 12, 2006. The order appointed father sole managing conservator

and mother possessory conservator of A.R.. Mother was given supervised visitation. In the order, the court found:

> [Mother] has no insight into how her behavior impacts her child, how her behavior sexualizes the child, how her behavior is sexually inappropriate with the child, how her behavior coached the child to say certain things, how her behavior alienates the child from [father], how her behavior creates the problems in her child that she complains of and how her repeatedly taping and questioning the child colors, contaminates and creates the child's statements. The statements and directives of [mother] to child show a lack of knowledge of how to set any boundaries with her child and show a lack of appropriate choices given to a child of [A.R.'s] age and show a severe lack of knowledge of the perceptual abilities of a child that age. The above as well as [mother's] enmeshment and lack of control of her child's behavior are harmful to the child.

The trial court also found there was credible evidence mother was a flight risk due to her emotional instability, her belief that father was harming the child, and her refusal to recognize and follow court orders. The court further found mother's access to the child should be supervised because unsupervised access would endanger the emotional welfare of the child. Mother was ordered to post a $50,000 bond to offset the costs father would incur attempting to recover the child if abducted by mother and ordered to attend weekly counseling and therapy sessions. Mother's supervised visitation was conditioned on the posting of a bond and participation in the court-ordered therapy. On May 8, 2006, the court entered an order of enforcement by contempt and suspension of commitment for violating court orders concerning the payment of child support and possession of the child. This appeal followed.[4]

## II. STANDARD OF REVIEW

We construe mother's seven issues as challenges to the trial court's exercise of discretion. On an abuse of discretion challenge, we are not free to substitute our own judgment for the trial court's judgment. *Bowie Memorial Hospital v. Wright*, 79 S.W.3d 48, 52 (Tex.2002). We can only

---

[4] Mother filed separate notices of appeal both of which are considered under this cause number.

find an abuse of discretion if the trial court "acts in an arbitrary or capricious manner without reference to any guiding rules or principles." *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex.1998). The court's decision must be "so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *BMC Software Belg. N.V. v. Marchland*, 83 S.W.3d 789, 801 (Tex. 2002).

## III. APPLICABLE LAW

### *The Imposition of Bond*

Mother's supervised access to the child was conditioned on court-ordered counseling and therapy sessions and posting a $50,000 bond. In her first issue, mother argues these restrictions impair her right to possession and constitute a de facto termination of her parental rights. We disagree.

The crux of mother's argument is because the $50,000 bond exceeds her ability to pay it is so burdensome it constitutes a termination of her parental rights. In support of her argument, mother points to the fact that she filed an affidavit of indigence and a motion for a free appellate record. Mother fails to mention, however, the pauper's affidavit was contested. After a hearing, the court determined mother failed to meet her burden of proof. The evidence presented at the hearing does not appear in this record. But the record does contain the court order sustaining the contest and finding mother is not entitled to appeal without making full payment for the clerk's record and all other costs. There is no other evidence in the record to support mother's claim she is without the means to post the bond, nor was the issue brought to the trial court's attention in any of her post-trial motions. Because there is no evidence mother was unable to post the bond, we find her argument concerning de facto termination unpersuasive. Therefore, we turn to the question of whether the court's order constitutes an abuse of discretion.

A court can limit a parent's rights of possession if it is in the best interests of a child. Tex. Fam. Code Ann. § 153.072 (Vernon 2006). The court may also condition access on a bond, and is empowered to set the amount and conditions. Tex. Fam. Code Ann. § 153.011 (Vernon 2006). In this regard, the Texas Family Code provides:

> If the court finds that a person who has a possessory interest in a child may violate the court order relating to the interest, the court may order the party to execute a bond or deposit security. The court shall set the amount and condition the bond or security on compliance with the order.

*Id.* Tex. Fam. Code Ann. § 153.502 (Vernon 2006) sets forth certain factors a court may consider to determine whether there is a risk of international abduction by a parent of the child. Although the court did not specifically find there was a risk the child would be removed from the country, the statutory factors concerning international abduction are instructive to the overall abduction analysis. Some of the factors courts consider include evidence that the parent:

> (1) has taken, enticed away, kept, withheld, or concealed a child in violation of another person's right of possession or of access to the child . . .;
>
> (3) lacks financial reason to stay in the United States, including evidence that the parent is financially independent, is able to work outside the U.S., or is unemployed;
>
> (6) has a criminal history *or a history of violating court orders.*

*See Id.* (emphasis added). The court found all of the foregoing factors present here. When mother met father, she was working as a waitress in a topless bar, but she was unable to hold a full-time job throughout the marriage. Mother is not currently employed. Mother owns no property in Dallas county. Mother's apartment, car and living expenses are provided by her family. The record does not reflect the amount of income accessible to mother, but she was able to borrow $50,000 from her parents to retain Ducote.

There was also considerable evidence to support the court's conclusion on the likelihood that mother would violate court orders. Mother violated the court's possession order on more than

-9-

one occasion, and was cited for contempt. Mother was also cited for contempt for violation of the court's order concerning child support. In addition, throughout the litigation mother demonstrated a flagrant disregard for the court's rules and orders. Mother refused to comply with discovery orders. She refused to attend court-ordered therapy. Although the court ordered the parties not to discuss the allegations of abuse with the child, mother not only continued the discussions but made videotapes in which she coached and encouraged the child to discuss the alleged abuse. Mother was eventually ordered not to go within a certain distance of the child. Despite the court's order, mother went to the child's counselor's office when the child was there. On two occasions, mother appeared on the doorstep of father's residence when she knew the child was there. During the trial, the court was frequently required to admonish mother because she refused to obey court rules and instructions. At one point, the jury was excused and the court warned mother she was in direct contempt of court because she had demonstrated total disregard and disrespect for the court's rules and orders. Mother's testimony is indicative of her overall attitude toward court orders and the judicial process. For example, when asked on cross-examination whether she had complied with the divorce decree and placed the child's modeling income in a separate bank account, mother replied "certainly not." Not only did mother demonstrate indifference to court rules and orders, but her advisor Ducote demonstrated this propensity as well.

Mother's alliance with the Justice for Children organization is also a factor to consider. It would not be unreasonable for the court to have been somewhat concerned about the influence Ducote's organization may have on mother. The Justice for Children group was very active in the litigation and in advising mother. Ducote was questioned about the activities of his organization and involvement in the abduction of the child in another case in which a mother made allegations of abuse. In its role as fact-finder, the trial court is the sole arbiter of a witness's credibility and the

-10-

weight to be given his testimony. *Bellefonte Underwriters Ins. Co. v. Brown*, 704 S.W.2d 742, 744-45 (Tex.1986). Although the record does not establish the extent to which mother's behavior was directed or influenced by this group or if any such influence was improper, the court could reasonably infer mother had been influenced by this group and would continue to be influenced in the future. Even if Ducote was not improperly advising mother, the record reflects he had a disruptive impact on the litigation.

The evidence of mother's mental instability is also significant. The court found mother was manipulating the child to manufacture allegations of sexual abuse. This manipulation occurred with no appreciation for the emotional damage done to the child. Mother sexualized the child, and gave every indication she would continue to do so. There is strong support for these findings in the record. Dr. John Zervopoulos, a clinical and forensic psychologist appointed to test and evaluate the family, testified concerning mother's mental health issues. Mother was previously hospitalized for mental health problems and released herself against her doctor's advice. Mother's mother had to obtain a restraining order against her. Dr. Zervopoulos found mother's belief concerning sexual abuse of the child was not well-founded. Based on his interviews with both parents and the child, he concluded there is insufficient evidence father engaged in inappropriate conduct. Though numerous experts and professionals concluded there was no or insufficient evidence of father's abuse, mother not only continues to maintain her belief that abuse occurred, but also fosters that belief in the child. Dr. Zervopoulos expressed concerns about mother's continued belief in the allegations and the impediment to the child's development caused by her mind-set. Based on his evaluation, Dr. Zervopoulos opined mother would continue her course of conduct because she is very attached to particular notions of abuse without critically examining these notions. He further testified there is no indication mother would choose to see things differently if other more plausible

reasons for the child's statements were established. Dr. Zervopoulos reported mother presents herself as a victim, and his testing of mother indicates she has significant psychological problems. The court further found mother continues to believe father is harming the child. Dr. Zervopoulos testified mother is unable to see the child's interests as different from her own. He also noted mother is willing to let the child be sad because she is angry with father. Mother told the child father was ruining her modeling career and tried to influence the child's feelings about father. Dr. Zervopoulos stated it was difficult to view the child's statements as reliable because mother kept reinforcing the statements, and it was likely the child was making the statements just to please mother. Mother's unsubstantiated beliefs, instability, and inability to consider the child's interest increase the likelihood she may abduct the child.

Mother contends she has never applied for a passport, either for herself or for the child. This is one of many factors to be considered, but it is not determinative. Mother also argues she is not a flight risk because her visitation is to be supervised. But supervision has not inspired mother to comply with the rules in the past. At a previous visitation center, mother was reprimanded for violating the rules by audio-taping the child. She was reprimanded again for a rules violation when she attempted to photograph the child with her cell phone. Eventually, mother was discharged from the facility because she refused to abide by the rules. In addition, the risk of abduction does not only exist during the period of supervised visitation. In the exercise of its discretion, the court could consider that the child could be abducted from her home, school, while at play, when she attends counseling, or en route to and from her supervised visitation with mother. Mother previously violated the court's order with visits to the father's residence when the child was there. Mother's pattern of behavior suggests it is not unreasonable to infer this could happen again. Moreover, one of the many videotapes mother made of the child show mother and child role playing a situation

-12-

where they are hiding from the father. On the tape, a statement is made to the effect that it is better if father does not know where the mother and child are located.

Mother also claims the bond is burdensome because she has been turned down by numerous bonding companies and must post the bond in cash. There is no clear explanation in the record why mother's requests for a bond have been declined. These refusals undermine mother's argument she is not a flight risk.

Mother argues the trial court should have considered "less burdensome" alternatives, such as putting an ankle monitor on the child. Although such alternatives may be less burdensome for mother, the ultimate consideration is the best interest of the child. Mother fails to address how this or any other alternatives might meet this goal.

We do not dispute the amount of the bond is significant. However, mother's behavior is extreme. Based on our review of the record, we cannot conclude the trial court acted arbitrarily or unreasonably when it determined mother was a potential flight risk and ordered the posting of the bond.

Similarly, ordering supervised visitation was neither arbitrary nor unreasonable. The experts opined mother's access to the child should be supervised. The trial court determined unsupervised access would endanger the emotional welfare of the child. There is ample evidence to support the trial court's determination that limitations on mother's possession are in the best interest of the child. We conclude the trial court did not abuse its discretion, and resolve mother's first issue against her.

*Attorney's Fees in the Nature of Child Support*

In her second issue, mother argues the trial court erred when it awarded attorney's fees in the nature of child support. To make these claims on appeal, mother was required to present the complaints to the trial court. *See* TEX. R. APP. P. 33.1; *Wal-Mart Stores, Inc. v. McKenzie* 997

-13-

S.W.2d 278,280 (Tex.1999). Our review of the record reflects the issue was not raised in any motion or by specific objection to the trial court. At the hearing where the order awarding attorney's fees was entered, the parties initially stipulated to the amount of attorney's fees. The parties also stipulated attorney's fees would not be the subject of an appeal. Mother's counsel subsequently withdrew the stipulation, stating generally that he objected to both the form and content of the entire order. The order addressed issues in addition to attorney's fees, but counsel did not specify why the order was objectionable. The attorney's fees issue was not raised in any subsequent motions. Accordingly, mother failed to preserve this complaint for appeal. We overrule the issue.

*Withdrawal of Counsel and Continuance of Trial*

In her third issue, mother complains the trial court erred when it granted counsel's motion to withdraw from representing her and denied her motion for continuance. The motion to withdraw about which mother complains was filed by Linda Risinger, who at that time, was mother's third attorney of record. On January 11, 2006, more than thirty days prior to the February 20, 2006 trial setting, Risinger filed the motion to withdraw. The motion stated there was good cause for withdrawal because the attorney was unable to communicate with the client, thereby causing a hardship in the representation, and mother refused to honor the contract concerning the payment of fees. The motion also listed all impending deadlines, and charted the status of discovery. The motion further stated a copy had been provided to the client with the appropriate notice. On January 26, 2006, the court conducted a hearing on the motion to withdraw. Mother appeared on her own behalf. The trial court granted counsel's motion to withdraw and denied the continuance.

Mother asserts the motion to withdraw was not timely and violated the local rules of the Dallas County Family Courts. Mother further asserts the court's "hearing and granting the motion was prejudicial and an improper ruling." The local rule upon which mother's argument is premised

provides a motion to withdraw shall not be presented within thirty (30) days of the trial date. Local Rule 9.01. The motion was filed on January 11, 2006, and heard by the court on January 26, 2006. Trial was set for February 20, 2006. The motion was timely under the local rules. We next consider whether the trial judge abused her discretion by allowing counsel to withdraw.

A motion to withdraw must be in writing, demonstrate good cause, and provide notice to the party. *See* TEX. R. CIV. P. 10. The rule imposes additional requirements if an attorney is to be substituted in the withdrawing attorney's place. *Id.* The withdrawing attorney must also notify the client in writing of any impending deadlines. *Id.* The motion filed by Risinger met these requirements.

Rule 10 does not define "good cause." However, the Texas Disciplinary Rules of Professional Conduct articulate considerations relevant to the consideration of Rule 10 motions. *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.15; *In re Posadas USA, Inc.*, 100 S.W.3d 254, 257 (Tex.App.–San Antonio 2001, orig. proceeding). Subsection (b) of Disciplinary Rule 1.15 lists specific instances when an attorney may seek to withdraw. Included among those instances are the following:

> (5) the client fails substantially to fulfill an obligation to the lawyer regarding the lawyer's services, including an obligation to pay the lawyer's fees as agreed, and has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled;
>
> (6) the representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the client; or
>
> (7) other good cause for withdrawal exists.

Risinger's motion listed all of these reasons as good cause for her withdrawal. At the hearing, Risinger testified mother failed to pay the fees they had agreed on in the contract mother signed, and she had informed mother she would seek to withdraw if the fees were not paid. After

–15–

mother had been informed of the pending withdrawal, on January 10, 2006, Risinger agreed to meet with mother and Ducote as a professional courtesy. Ducote and another attorney were present. Although Risinger was not aware of it at the time, mother listened to the meeting behind a two-way glass mirror.

Risinger further testified she received advice from mother and Ducote on an almost daily basis. Risinger also described how mother would not cooperate, return phone calls, or respond to e-mail messages. Mother also refused to participate in the preparation of the witness list, lining up experts, and obtaining expert reports. Risinger testified mother directed that all expert findings had to be sent to mother and Ducote for approval. Risinger further testified that mother constantly refused to follow instructions or obey court orders. Although the agreement between Risinger and mother specified Risinger would be paid a trial retainer, and Risinger repeatedly reminded mother that she would not go to trial without the retainer, the retainer had not been paid. Risinger stated the continued representation would work a financial hardship on her law practice and the relationship between mother and herself was such that she could not represent mother.

Risinger's paralegal also testified. The paralegal told the court she had been present on numerous occasions when Risinger had reminded mother about the necessity of the trial retainer. The paralegal also testified about telephone conversations between Risinger and mother when Risinger had to terminate the conversation because mother became overly emotional. On these occasions, the paralegal could hear mother screaming at Risinger over the telephone.

Mother was given the opportunity to cross-examine the witnesses, but she declined. Mother stated she did not oppose the withdrawal as long as the court would grant her a continuance to enable her to secure other counsel. Mother also told the court she disagreed with her counsel's testimony about discovery and her lack of cooperation. The trial judge informed mother that based

on her experience with mother in the case, she was inclined to believe counsel's version of events. The court noted mother had a history of not obeying court orders, had her ability to present evidence diminished because of her refusal to turn over discovery, and had held up the case for many months because she refused to participate in the evaluation by the court-appointed psychologist.

There is no dispute Risinger and mother entered into a written fee agreement that set forth mother's obligation to pay a trial retainer. There is also no dispute the retainer was not paid. The record demonstrates that requiring Risinger, a sole practitioner, to continue her representation of mother in the upcoming trial would impose an unreasonable financial hardship. The testimony at the hearing and the evidence in the record clearly demonstrate that Risinger's representation of mother had become unreasonably difficult. The restrictions placed on the attorney and mother's refusal to cooperate support Risingers' establishment of good cause for her withdrawal. Consequently, the trial court did not err when it granted the motion to withdraw. *See In Re Daniels*, 138 S.W.3d 31, 35 (Tex. App.–San Antonio 2004, orig. proceeding).

Mother maintains the court erred by granting the motion to withdraw because it did not also grant the motion for continuance. Although appellant makes the vague statement that there were many motions for continuance, we interpret the alleged error as directed toward the motion made prior to trial presented by mother and subsequently re-urged by counsel. According to mother, the trial court failed to protect her valuable right to be represented by counsel. In support of her argument, mother relies on *Moss v. Malone*, 880 S.W.2d 45 (Tex.App.–Tyler 1994, writ denied). This reliance is misplaced. *Moss* involved a defective motion that did not comply with rule 10. Here, the motion meets the requirements of the rule and good cause for withdrawal was shown.

Mother's suggestion that she was abandoned and without counsel on the eve of trial is disingenuous because mother had numerous counsel advising her throughout the litigation.

–17–

Although not admitted to practice in the trial court, the evidence shows Ducote and his organization had been involved in the case from an early stage; their interaction with mother's counsel began with mother's first counsel of record. Thomas Burton, an attorney with the Justice For Children group, was present at the hearing on the motion, passing notes to mother. Burton entered an appearance on mother's behalf on February 6, 2006. Attorney Richard Wright entered his appearance on mother's behalf on the same date. After counsel formally appeared, the motion for continuance was re-urged on the same grounds, and was also denied.

Mother admits in her brief, and it is well-established that the determination concerning the continuance of a trial is a matter within the discretion of the trial court. *See Gen. Motors Corp. v. Gayle*, 951 S.W.2d 469, 476 (Tex. 1997) (orig. proceeding). Generally, the court should grant a continuance if a party has no attorney through no fault of their own. *See State v. Crank*, 666 S.W.2d 91, 94 (Tex. 1984). *But see, St. Gelais v. Jackson*, 769 S.W.2d 249, 254 (Tex.App.–Houston [14th Dist.] no writ) (denial of continuance not abuse of discretion when withdrawal party's fault). Mother insists she is not to blame for her attorney's withdrawal, but we are not convinced. A client who fails to honor a lawyer's fee agreement, subjects the attorney to verbal abuse, disobeys court orders, and refuses to follow counsel's advice should not be surprised when the lawyer seeks to terminate the representation. Months before the motion for continuance was filed, the court warned the parties no continuance would be granted. By the time the motion for continuance was filed, mother's obstreperous conduct had already caused several delays in the case. The court believed prompt resolution of the case was in the best interest of the child, and its determination was neither arbitrary nor unreasonable. We find no abuse of discretion.

Moreover, even if the trial court had erred by not granting mother additional time to hire an attorney, mother has not shown how the failure to grant the continuance probably caused the

–18–

rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a); *Bank of Texas, N.A., Trustee v. Mexia*, 135 S.W.3d 356, 364 (Tex.App.–Dallas 2004, pet. denied). We resolve mother's third issue against her.

*Hearing on the Motion to Recuse*

In her fourth issue, mother assigns error to actions taken by the trial court after she filed motions to recuse. The crux of mother's assertion is although the motions were forwarded to the presiding judge, the trial court was not empowered to act because the presiding judge did not conduct a hearing.

Mother filed her first motion to recuse on February 1, 2006, five days prior to a scheduled hearing. The motion was not verified. Mother filed an amended motion the next day, including the verification, but not the original motion to which the verification attested. Despite the procedural irregularities, the motions were forwarded to the presiding judge. On February 3, the presiding judge entered an order denying the motions. The trial judge took no action between the time the motion was filed and the entry of the order denying the motion.

On May 5, 2006, three days before a hearing scheduled on May 8, 2006, mother filed another motion to recuse. Again, the motion was referred to and denied by the presiding judge. The order, signed on May 8, 2006, states the motion is untimely and lacks new meritorious grounds to warrant a hearing.

TEX. R. CIV. P. 18a(a) provides, in pertinent part:

At least ten days before the date set for trial or other hearing . . . any party may file . . . a motion stating grounds why the judge before whom the case is pending should not sit in the case . . . The motion shall be verified.

When a judge is presented with a motion to recuse, he or she has only two options; recusal or referral of the matter to the administrative presiding judge. *Brosseu v. Ranzou*, 28 S.W.3d 235,

–19–

238 (Tex.App.–Beaumont 2000, no pet.). Once the motion is referred to the presiding judge, except for good cause, the sitting judge is to "make no further orders and . . . take no further action in the case . . . prior to a hearing on the motion." TEX. R. CIV. P. 18a(d). Failure to comply with the rule renders any actions taken subsequent to the violation void. *Brousseu*, 28 S.W.3d at 238. In support of her argument that the trial court acted improperly, mother points to an exchange between counsel and the trial court during the hearing on the motion for continuance. Mother attempted to raise the issue of entitlement to a hearing on the motion to recuse after the presiding judge had ruled. In response, the court stated: "[s]ir, I'm not addressing that. If you have issues with the motion to recuse that goes with [the presiding judge]. Start on your motion for continuance, I have no jurisdiction over those issues." This exchange demonstrates the opposite of mother's contention. The trial court properly refused to consider any issues pertaining to the recusal. The trial court took no action between the time the motions were filed and the order of denial was entered by the presiding judge. After the motions were denied, the trial court was once again empowered to act. Because the court complied with the rule, there was no error. We resolve mother's fourth issue against her.

### *Failure to take Judicial Notice*

In her sixth issue, mother assigns error to the trial court's refusal to take judicial notice of domestic violence charges alleged to be pending against father. During trial, mother testified without objection that a domestic violence case was pending against father. After mother's testimony, counsel made an oral motion to the court requesting the court take judicial notice of the adjudicative facts of the domestic violence case. The trial court refused.

Mother argues judicial notice is mandatory, citing our decision in *Brown v. Brown*, 145 S.W.3d 745, 750 (Tex.App.–Dallas 2004, pet. denied). Mother's argument ignores the critical distinction between *Brown* and this case. In *Brown*, we held a court may take judicial notice of the

–20–

records of another court when it is provided with those records. Once a court has been provided with the necessary information, such notice is mandatory. *Id.* Unlike *Brown*, the trial court was provided with no records. Moreover, mother's counsel was well aware of the need for the records; there was extensive discussion at one of the many pre-trial hearings about the necessity of obtaining the records. It is axiomatic that when the court is provided with no record of the facts, there is nothing for the court to judicially notice. We conclude the trial court did not abuse its discretion when it refused mother's request for judicial notice.

### Ignoring and Predetermining the Merits

In a sub-part of her sixth issue, mother asserts the trial court ignored and predetermined the merits of other evidence of abuse. Mother's formulation of this issue consists of a multifarious litany of alleged wrongs, including complaints about rulings on temporary orders and comments made from the bench. We cannot consider this issue because it is multifarious and inadequately briefed. *See Green v. Kaposta,* 152 S.W.3d 839 (Tex.App.–Dallas 2005, no pet.); TEX. R. APP. P. 38.1(h). Mother's sixth issue is overruled.

### Charge Error

In her fifth issue, mother contends the trial court erred by refusing to instruct the jury: (a) that there is a statutory presumption against custody when there is evidence of family violence; and (b) that mother has a statutory duty to protect the child from abuse. Father argues any error was not properly preserved for appeal and has therefore been waived.

"Rule 277 of the Texas Rules of Civil Procedure requires a trial court to submit 'such instructions and definitions as shall be proper to enable the jury to render a verdict.' " *State Farm Lloyds v. Nicolau,* 951 S.W.2d 444, 451 (Tex.1997) (quoting TEX. R. CIV. P. 277). An appellate court reviews a trial court's decision to submit or refuse an instruction under an abuse of discretion

–21–

standard. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex.2006). The trial court has broad discretion in submitting jury questions so long as the questions submitted fairly place the disputed issues before the jury. *Rosell v. Central-West Motor Stages, Inc.*, 89 S.W.3d 643, 653 (Tex.App.–Dallas 2002, pet. denied). When submitting the jury charge, a trial court is afforded more discretion when submitting instructions than when submitting questions. *Id*; *Wal-Mart Stores, Inc. v. Middleton*, 982 S.W.2d 468, 470 (Tex.App.-San Antonio 1998, pet. denied). To be proper, an instruction "must (1) assist the jury; (2) accurately state the law; and (3) find support in the pleadings and the evidence." *Texas Worker's Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex. 2000). Even if a trial court abuses its discretion, we do not reverse unless the omission of the instruction probably caused the rendition of an improper judgment. *Shupe*, 192 S.W.3d at 579. To determine whether an alleged error in the charge is reversible error, we consider the pleadings of the parties, the evidence presented at trial, and the charge in its entirety. *American Title Co. v. BOMAC Mortgage Holdings, L.P.*, 196 S.W.3d 903, 907 (Tex. App.–Dallas 2006, no pet.).

Mother filed her requested charge in accordance with the court's pretrial order. Mother's proposal requested the jury be instructed on certain provisions in TEX. FAM. CODE ANN. § 261.001 (Vernon 2006). The requested charge contained no authority for the submission of the issue in a case of this nature. At the charge conference, mother elaborated on the request, seeking instructions that sexual conduct harmful to a child's mental, emotional, or physical welfare is abuse, and that a parent has a duty to make a reasonable effort to prevent sexual conduct harmful to a child. The trial court declined the requested instructions, noting the Family Code provisions cited by mother pertain to actions in which CPS is investigating allegations of abuse, and are not among the rights, powers, and duties pertaining to parents in a custody dispute. Mother's counsel objected, but other than asserting the instruction should be included, failed to specify how the omission of the instruction was error.

–22–

Consequently, this general objection did not preserve the alleged error for appeal. *See* TEX. R. CIV. P. 274; TEX. R. APP. P. 33.1(a)(1)(A); *Castleberry v. Branscum*, 721 S.W.2d 270, 276 (Tex. 1986). Even if the complaint had been preserved, mother cites to no authority, nor are we aware of any, requiring a fact-finder in a custody dispute to consider the factors enumerated in TEX. FAM. CODE ANN. § 261.001. Mother also fails to demonstrate how the failure to include such an instruction led to the rendition of an improper judgment.

The second omitted instruction about which mother complains was requested after the charge conference, but before the charge was read to the jury. Mother requested the court instruct the jury that under TEX. FAM. CODE ANN. § 153.04 (Vernon 2006), there is a statutory presumption against custody when there is a history of family violence. When mother requested this instruction, the court noted the charge conference had concluded the preceding day. Nonetheless, the court allowed counsel to make a bill of exception. Mother did so by making a general oral objection to the court's refusal to include the newly requested instruction. Mother only complained about the failure to include the instruction; she did not explain to the trial court why the exclusion might constitute error. The court denied the request. The requested instruction was not included in the proposed instructions initially tendered to the court, nor was the instruction tendered in writing when the bill of exception was made. When the court omits an instruction or definition, a party must make a request in writing. TEX. R. CIV. P. 274; TEX. R. CIV. P. 278; *Gerdes v. Kennamer*, 155 S.W.3d 523, 534 (Tex.App.–Corpus Christi 2004, pet. denied). Thus, any error was not preserved for our review.

Even had the issue been preserved, we cannot conclude the omission was reversible error. After hearing all of the evidence, the trial court found there was not a pattern of family violence. The jury heard evidence concerning family violence. They were informed criminal charges were pending against father based on mother's allegation of family violence. This evidence was introduced in a

-23-

videotape made by mother and played for the jury. There was also evidence concerning mother's family violence in the form of a protective order entered against mother by her own mother. Thus, the full range of evidence concerning family-violence was available to the jury-in-making their determination. Any error was harmless. Mother's fifth issue is overruled.

### Best Interest of the Child

In her seventh issue, mother argues the court erred because it failed to consider the best interest of the child. In support of her argument, mother argues because there was an alleged lack of advocacy for the child, "it is unlikely the *Holley* factors were adequately considered or investigated" *See Holley v. Adams*, 544 S.W.2d 367,372 (Tex. 1976). Mother further asserts there is no indication the trial court considered the desires of the child "as required by *Holley*". We disagree with mother's interpretation of both *Holley* and the record.

The best interest of the child shall always be the primary consideration of the court in determining questions of managing conservatorship, possession, and support of and access to a child. TEX. FAM.CODE ANN. § 153.002 (Vernon 1996). Trial courts have wide discretion in determining what is in the best interest of the child. *Weimer v. Weimer*, 788 S.W.2d 647, 650 (Tex.App.–Corpus Christi 1990, no writ). The trial court's judgment regarding what serves the best interest of the child with regard to child support and visitation, specifically the establishment of terms and conditions of the conservatorship, is a discretionary function of the trial court and will only be reversed upon a determination that the trial court has abused its discretion. *MacCallum v. MacCallum*, 801 S.W.2d 579, 582 (Tex.App–Corpus Christi 1990, writ denied). This is because the trial court is in the best position to observe the demeanor and personalities of the witnesses and can feel forces, powers, and influences that cannot be discerned by merely reading the record. *In the Interest of T*, 715 S.W.2d 416, 418 (Tex.App.–Dallas 1986, no writ). The test for abuse of

discretion is whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex.1990).

*Holley* provides a list of non-exclusive factors the court may consider. *See Holley*, at 371-72; *In re J.A.*, 109 S.W.3d 869, 876-77 (Tex.App.-Dallas 2003, pet. denied). Proof of best interest is not limited to these specific factors, nor do all factors always apply in every case. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The focus is on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective Servs.*, 907 S.W.2d 81, 86 (Tex.App.-Dallas 1995, no writ). There was no indication the child was sufficiently mature to express a parental preference, and the court was not required to consider the wishes of the child. The court's finding that mother manipulated the child's statements and influenced the child to turn against the father is also significant. In light of this manipulation, it is questionable whether any expression of preference by the child would truly evidence the child's desires.

Mother also contends the trial court's limitations on her access to the child do not comport with the recommendations of the experts. We disagree. Although the experts stated regular contact with mother was in the best interest of the child, these statements were qualified. Dr. Zervopoulas indicated mother should have more access to the child as long as her interaction does not begin to generate the type of difficulties he previously observed. Dr. Zervopoulas also opined mother's access to the child should be supervised. Moreover, regular contact does not necessarily equate to managing conservatorship. Dr. Zervopoulas had parent-child sessions with both parents. He observed comfortable and affectionate interaction between father and the child. The child complied with the father's instructions and boundaries. Mother's interaction with the child was completely different. The child ran up and down the halls of the office, and mother could not control her. The

-25-

child refused to enter the room, threw a tantrum, and began hitting mother. Mother's attempts at instruction went unheeded. Dr. Zervopoulas concluded mother's emotional issues get in the way of the parenting the child requires, and mother is unable to set limits for the child. Zervopoulas recommended the child live with father because his lifestyle, and sense of structure and appropriateness would be better for the child. Gail Inman, the child's court-appointed counselor concurred with Dr. Zervopoulas. Inman opined, based on numerous observations, the child functions better behaviorally when she is with her father and grandparents. During supervised visitation, mother admitted to the counselor she kept late and erratic hours, and the child maintained the same schedule when she was with her. Mother also admitted she had difficulty controlling the child. We conclude the trial court did not abuse its discretion in determining the best interest of the child. Mother's seventh issue is overruled.

Having resolved all of mother's issues against her, we affirm the judgment of the trial court.

MARTIN RICHTER
JUSTICE

060589F.P05

-26-